1  Robert B. Carey (011186)
   Leonard W. Aragon (020977)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
3  11 West Jefferson Street, Suite 1000
   Phoenix, Arizona 85003
4  Telephone: (602) 840-5900
   rob@hbsslaw.com
5  leonard@hbsslaw.com

6
   Scott A. Kamber (*Admitted Pro Hac Vice*)
7  KAMBERLAW LLC
   142 West 57th Street
8  11th Floor
9  New York, New York 10019
   Telephone: (646) 964-9600
10 skamber@kamberlaw.com

11 Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Jeremy Wenokur and Secondary Life Three, LLC, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>AXA Equitable Life Insurance Company,<br><br>Defendant. | No. 17-cv-00165-PHX-DLR<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiffs Jeremy Wenokur ("Wenokur") and Secondary Life Three, LLC ("Secondary Life"), on behalf of themselves and all others similarly situated, for their Complaint against Defendant AXA Equitable Life Insurance Company ("AXA"), states as follows:

## I.   NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiffs, Jeremey Wenokur and Secondary Life, and similarly situated owners of Athena Universal Life II insurance policies issued by AXA.

2. Plaintiffs seek to represent a class of AXA Athena Universal Life II policyholders who are subject to an unlawful, excessive, and inequitable cost of insurance ("COI") increase by AXA. AXA's COI increase violates the plain terms of Plaintiffs', and all putative class members', Athena Universal Life II ("AUL II") insurance policies.

3. The AUL II policies at issue are all policies in an AXA product line called Athena Universal Life II, and all feature flexible-premium, universal life ("UL") policies. The key features of UL policies are that they allow policyholders to pay the minimum amount of premiums necessary to keep the policies in force. This feature differs from other kinds of whole life insurance policies that require fixed monthly premium payments. In contrast, owners of UL policies need only pay an amount sufficient to cover the COI charges and certain other specified expenses. This allows UL policyholders to minimize their capital investment in the policies and to generate greater rates of return through investments *other than* the UL insurance product. Any optional premium amounts a policyholder pays (in excess of COI charges and expense components) are applied to a policy's "Policy Account," sometimes known as "policy account value" or "cash value." These excess premiums earn interest.

4. AXA expressly markets the AUL II policies to policyholders by utilizing "fact cards" touting the features that policyholders are able to "design premium payments according to your budget" and can "choose the amount and frequency of your premium payments." Indeed, the first page of the AXA policy contains a boldface title calling the

1

1    policy a "Flexible Premium Universal Life Insurance Policy" and describes the policy as
2    a "flexible premium universal life insurance policy," where the policyholder can, within
3    limits, "make premium payments at any time and in any amount."
4        5.    Although AXA markets the UL policy products specifically to
5    policyholders seeking to minimize their premium payments and keep policy account
6    values as low as possible, AXA has wrongfully sought to punish policyholders who have
7    exercised their option to do just that. For AXA imposed drastic COI rate increases on
8    certain AUL II policyholders, improperly targeting a subset of policyholders who
9    exercise their contractual rights to keep their accumulated policy account values as low as
10   possible and pay flexible premiums.
11       6.    AXA improperly targeted COI rate increases to a subset of universal life
12   policies that it selected in part for their pattern of minimizing premium payments (and
13   keeping policy values as low as possible) – even though the policies expressly permit that
14   premium pattern, and were explicitly marketed to policyholders on the basis that the
15   policies allowed for minimal premium payments and low policy account values.
16       7.    AXA has admitted that the COI increases for AUL II policies are targeted
17   at only a subset of policies in the same policy class at issuance. Policies in the subset
18   targeted for the drastic COI increase have two main features in common: the policies
19   have issue ages over age 70, and current face values of over $1 million.
20       8.    The COI increases AXA imposed are exorbitant, and reflect a range of
21   increases from approximately 27% to 70% over prior COI charges.[1]
22       9.    Through its exorbitant and improper COI rate increases, AXA seeks to
23   force Plaintiffs, and other similarly situated AXA policyholders, to take one of two
24   unsavory courses of action. Policyholders in the improperly targeted subset of AUL II
25   policies must either (a) pay exorbitant premiums that AXA knows would no longer

---

[1] Industry sources report that for policies with a face value of $1 million and an issue age of 70-70, the COI increased by 27%, while for policies with a face value of $1 million and an issue age of 80 and up the COI increase was 68%.

2

justify the ultimate death benefits, or (b) lapse or surrender their policies and forfeit the premiums policyholders have previously paid.

10. Under either scenario, AXA stands to reap huge profits—either through higher premium payments or by eliminating policies (through lapses or surrenders), all while keeping the premiums that have been paid to date. In its SEC Form 10-Q for the period ended September 30, 2015, AXA stated that the COI increase will be larger than the increase it previously had anticipated, resulting in a $46 million increase to its net earnings – a figure that is in addition to the profits that management had initially assumed for the COI increase.

11. AXA's conduct is not permitted by the policies at issue and is both unlawful and inequitable.

12. While the policies permit AXA to adjust the cost of insurance rates periodically, AXA may do so only based on certain, enumerated factors, such as changes to reasonable assumptions about mortality and investment experience. "Minimal funding" of policies is not one of those enumerated factors.

13. Publicly, and as mere pretext, AXA stated that the COI increase is warranted because the affected insureds are dying sooner than AXA anticipated, and its investment experience has been less favorable than expected.

14. However, AXA's pretextual explanation is belied by the facts. Evidence shows that mortality trends for the affected insureds have *improved substantially* since the time the policies issued, and investment experience does not depend on the premium payment patterns of any particular policyholder or subset of policyholders, but rather relates to the performance of AXA's overall investments.

15. AXA's pretextual explanation also is contradicted by its prior admissions. AXA, like other insurance companies, was required to file answers to interrogatories and give actuarial opinions every year as to whether any of their anticipated policy experience has changed. Notably, in AXA's 2014 filing, dated February 25, 2015, AXA replied "no" to the interrogatory asking whether its "anticipated experience factors underlying any

nonguaranteed elements [are] different from current experience." Given its "no" response—a mere seven months before its massive COI rate increase was announced—AXA cannot credibly justify the enormous rate increase on the grounds that it was "based on" a change to anticipated experience.

16. Also, by targeting only a subset of a risk class of AUL II policyholders, AXA further violated the terms of the policies. The AUL II policies at issue here require that any change in COI rates "will be on a basis that is equitable to all policyholders of a given class." Yet, AXA has admitted that its exorbitant COI increases are directed at only a certain subset of policies of the same class at issuance (those with issue ages above 70 and a current face value above $1 million). Because there is no equitable basis to single out that subset of policyholders for an increase, the increase is impermissibly inequitable.

17. As publicly reported, the AXA COI increases range from 27% to 68% as compared to some prior COI charges. Such massive COI increases are not warranted under the enumerated policy factors, violate the terms of the policies, and are unlawful and inequitable.

18. Upon information and belief, this is not the first time that AXA has improperly, and in violation of the policy terms, increased COI charges for Plaintiff and Class members.

## II.  THE PARTIES

19. Plaintiff, Jeremy Wenokur, a resident of Utah, is the owner of an AUL II life insurance policy (number 156213337), insuring the life of John Doe.[2] The Doe policy was issued by AXA in Arizona, on or about July 5, 2006, and currently has a face value of $5 million (the "Doe Policy"). At issuance, John Doe was age 75. The Doe Policy remains in-force with AXA. The Doe Policy is subject to AXA's COI increase that was announced in October 2015, and that was reflected in the first monthly deduction processed on or after March 8, 2016.

---

[2] For privacy reasons, Plaintiff Jeremy Wenokur has substituted "John Doe" for the name of the actual insured.

4

20.     Plaintiff, Secondary Life Three, LLC (a Delaware limited liability company, with a principal place of business in Rockville, Maryland), is the owner and beneficiary of an AUL II life insurance policy (number 156207908), insuring the life of Jane Roe.[3] The Roe policy was issued by AXA in Florida, on or about April 5, 2006, with a current face value of $5 million (the "Roe Policy"). At issuance, Jane Roe was age 79. The Roe Policy remains in force with AXA. The Roe Policy is subject to AXA's COI increase that was announced in October 2015, and that was reflected in the first monthly deduction processed on or after March 8, 2016.

21.     Defendant AXA is a corporation organized and existing under the laws of New York, having its corporate headquarters in New York, New York. The policy lists AXA's home office at 1290 Avenue of the Americas, New York, New York.

### III.     JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) in that this is a class action with diversity between at least one class member and one defendant and the aggregate amount of damages exceeds $5,000,000. This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d).

23.     This Court has personal jurisdiction over Defendant because it has conducted, and continues to conduct, business in the District of Arizona, and because Defendant committed acts and omissions complained of herein in the District, including issuing many of the policies giving rise to the complaint in the District of Arizona. Defendant has conducted business in the State of Arizona since March 7, 1899, and is a licensed Life & Disability Insurer by the Arizona Department of Insurance. Upon information and belief, Defendant has collected billions in premiums in the state of Arizona, including collecting over $162 million in premiums in 2015 alone, the last year for which data was reported.

---

[3] For privacy reasons, Plaintiff Secondary Life has substituted "Jane Roe" for the name of the actual insured.

5

1  24.  Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c)
2  because the events giving rise to one Plaintiff's causes of action occurred in this District.

### IV.  FACTUAL BACKGROUND

**A.  The Policies**

25.  The policies at issue are all individual, flexible-premium, universal life policies, marketed under the product name Athena Universal Life II policies, and issued by AXA from 2004 to 2007. Hallmarks of the policies at issue are that there are no fixed or minimum premium payments specified in the policies.

26.  Such flexible-premium policies are preferred by some policy owners specifically because they allow the owners to pay the bare minimum required to keep the policy in force (i.e., the policy owners can keep the policies' Policy Account Value as low as possible) while preserving capital for other investments that may yield higher returns than the interest to be credited on the Policy Account. It is up to policyholders to decide whether to keep their Policy Account Value as close to zero as possible (by paying only the bare minimum to cover COI and the other administrative expenses needed to keep the policy in effect), or to pay more of the premium in order to build the cash amount subject to interest payments in their Policy Account. By contrast, in the case of fixed-premium policies, the insurer has the use of the premiums in excess of the COI charge and can profit on its own investment of those excess premiums.

27.  AXA has explicitly promoted these flexible-premium policies as policies that allow policyholders to "design premium payments according to your budget" and to "choose the amount and frequency of your premium payments."

28.  As one would expect, the amount of the COI charge is highly material to universal life policyholders for two key reasons: (1) the COI charge is typically the highest expense that a policyholder pays; and (2) the COI charge is deducted from the Policy Account (i.e., the savings component) of the policy, so the policyholder forfeits the COI charge entirely to AXA (this is in contrast to the balance of premium payments, which, after expenses are deducted, are deposited into the Policy Account and credited

6

with interest by AXA).

29. All AXA policies in the AUL II product line contain the same common language about how the COI rates will be determined:

> We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision.

30. In turn, the "Changes in Policy Cost Factors" provision states:

> Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) ***will be on a basis that is equitable to all policyholders of a given class***, and will be determined ***based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse***. . . . Any change in policy cost factors will be determined in accordance with ***procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which the policy is delivered***.

(emphasis added).

31. The policies at issue are all contracts of adhesion: they are form policies, and insureds are not permitted to negotiate different terms.

**B.   AXA Imposes Unlawful COI Increases**

32. On or about October 1, 2015, AXA announced that, effective with the first monthly deductions occurring in 2016, it would increase the COI rates for AUL II policies with issue ages of 70 or older and with current face amounts of $1 million and higher. AXA notified Plaintiffs of the future increase by letters dated October 5, 2015.

33. In a slight change of course, in December 2015, AXA announced that it would defer the effective date for the COI increase until the first monthly deduction processed on or after March 8, 2016.[4]

34. AXA has provided no justification for the COI increase other than to claim it is based solely on two factors: allegedly less favorable "future mortality and investment experience" over the past few years. The Wall Street Journal quoted an AXA

---

[4] The purported reason for the delay was to enable more policyholders to obtain illustrations reflecting the new COI increase.

7

spokesperson explaining the reason for the increase as: "the company had concluded one of its older life-insurance products wasn't performing as expected because policyholders were dying sooner and investments were earning less than forecast when the policies were sold."

35. Similarly, AXA's SEC Form 10-Q, for the period ended September 30, 2015, stated, "the Company is raising the COI rates for these policies as management expects future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established." And, AXA has distributed a FAQ on the "Athena Universal Life II COI Rate Change," in which the increase is explained as follows: "We expect future mortality and investment experience to be less favorable than what was anticipated when the current schedule of COI rates was established and because our view of the anticipated experience has changed, this has necessitated a change in COI rates."

**C. The COI Increases Violate the Policy**

36. The COI increases breach the policy in at least three ways: (1) they are not "based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapse"; and (2) they are not "equitable to all policyholders of a given class."

    **1. AXA's Increase Is Not Permitted by the Enumerated Factors**

37. The policies at issue list the only six "reasonable assumptions" that may trigger a COI rate change under the terms of the policy. The six factors a permitted COI may be "based on" are "expenses, mortality, policy and contract claims, taxes, investment income, and lapses." Any COI rate adjustments must be 'based on' the enumerated factors, and only those factors.

38. AXA publicly stated that the 2016 increase was based on only two factors, which are investment experience and mortality. However, neither of those factors credibly warrants the increases.

8

**2.   Mortality Has Improved**

39.   Contrary to AXA's claims that the increase is warranted in part because it found that "policyholders were dying sooner" than it expected, mortality rates have actually improved steadily each year – i.e., mortality risks have only gotten better over time, as people are living much longer than anticipated when the products were priced and issued.

40.   The policies at issue specifically utilized the "1980 Commissioners Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables" (for attained ages 18 and over) ("1980 CSO") as the basis for establishing maximum insurance costs.[5]

41.   In the intervening years, there have been multiple studies and updates to mortality tables relied upon by the insurance industry.

42.   For example, the 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries ("SOA") (which performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables). Periodically the Society will publish an updated table to reflect the evolving industry experience. Major updates they have published over the last few decades include:

- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table
- 2008 Valuation Basic Table ("VBT")
- 2015 Valuation Basic Table

43.   The 2001, 2008 and 2015 Valuation Basic tables each show *significant mortality improvements* from the 1990-1995 Basic tables, demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to

---

[5] These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies. A mortality table is a chart showing the rate of death at a certain age.

improve substantially and consistently, and that trend continues. AXA itself recognized that in 2014, the SOA finalized new mortality tables and a new mortality improvement scale, reflecting improved life expectancies and an expectation that the trend of improving mortality will continue.

44. For older aged insureds—like those impacted by the extreme COI increase—the trend of improving mortality is even more pronounced. In particular, the 2008 VBT showed an improvement for older age mortality as compared to prior tables used at the time the AUL II policies were priced. More importantly, the trend in improving mortality for older ages continued with the introduction of the 2014 VBT.

45. In the face of improving mortality experience, as reflected in the updated tables, there is simply no negative mortality experience to justify an increase in the COI, let alone the steep increases AXA imposed. Indeed, through early 2015, AXA continued to inform regulators that it had not in fact observed a negative change in its mortality experience, wholly undercutting its pretextual basis for the increase.

### 3. Investment Income Cannot Warrant the Increase

46. AXA also claims that the increase was based on a change to its expectations of future "investment experience." Specifically, that its "investments were earning less than forecast when the policies were sold." Although "investment experience" is not a listed factor that may be considered for increasing COI rates, "investment income" is a listed factor.

47. AXA aggregates its capital to make investments into various financial instruments and assets, such as bonds and securities. These investments earn "income" that changes depending on how well the assets are performing. Whether investment income rises or falls, the performance of those investments is entirely unrelated to the funding decisions or premium payment patterns of an individual policyholder or even a subset of policyholders. Therefore, even if AXA's investment income has changed, this factor cannot justify inflicting a COI increase solely *on the subset of AUL II policies* upon which AXA has sought to impose the COI increase (those with higher issue-ages

1  and face-amounts).

2  48. Moreover, in order to impose a COI increase due to a change in reasonable
3  investment income assumptions, the increase should, in some way, actually correspond to
4  observed changes in investment income. However, since approximately 2004, in its
5  public reports, there has been no discernable change in the pattern of AXA's investment
6  income, and no correlation between "investment income" and premiums received, that
7  would in any way justify the exorbitant COI increase in 2016.

### 4. Minimal Funding is Not An Enumerated Factor

49. Make no mistake; despite the pretexts offered by AXA, there is no dispute that the COI increase specifically targets policyholders who exercised their contractually permissible right to minimally fund their policies. But funding patterns, or Policy Account Value, are not enumerated factors that AXA may consider in adjusting its COI rates. Further, even if AXA were somehow permitted to consider funding patterns in increasing COI rates, it could not have had any change in its "reasonable assumptions" as to how these policies would be funded. They were marketed as flexible-premium policies; at issuance, AXA knew these policies would attract owners, such as life settlement investors, who typically minimally fund the policies.

### 5. AXA'S Increase is Not Equitable

50. The policy mandates that "Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class." As a result, a policy change may not unfairly discriminate against certain policyholders within the same class.

51. Here, AXA's COI increase is not "equitable to all policyholders of a given class" because it impermissibly singles out and discriminates against a subset of policyholders within a larger risk class.

52. First, the AXA increase specifically and unfairly targets policyholders who exercised their contractually permissible right to minimally fund their policies. AXA increased the COI rate only on a group of policyholders that were selected in part for

11

their pattern of premium payments; specifically, the increases target owners who minimize their premium payments and keep policy values as low as possible. Although AXA states that it is imposing an increase on the affected block because "investment experience" is less favorable than it anticipated, it appears the real reason that the affected group of policyholders was selected for the increase is because of their (entirely permissible) low funding patterns.

53. But it is not equitable to impose an increase on policyholders based on their funding patterns. The policies are expressly marketed and designed as flexible-premium policies that permit policyholders to select whatever funding pattern they choose, provided only that they pay enough to keep the policies in force. It is simply inequitable for AXA to punish policyholders merely for exercising these fundamental contractual rights. More importantly, the policies, which enumerate the only permissible factors to consider in increasing COI rates, do not mention minimal funding or premium payment patterns as permissible factors to consider when increasing the COI.

54. Second, there is no actuarial justification for increasing the COI rates on the selected group of policies – those with issue ages 70 and above and current face value amount of $1 million and above. The policy does not permit AXA to use issue-age or face value to determine who gets a COI increase. Rather, of the limited permissible factors, AXA only claims that mortality and investment income are relevant to its decision to increase COI rates. But AXA cannot reasonably expect that the insured on a policy that issued at age 70 with $1,000,000 in face value is likely to die materially sooner than the insured on a policy that issued at age 70 with $900,000 in face value. Nor is it plausible that AXA's reasonable assumptions about future mortality and investment income experience would differ between these two policies. Because insurance companies do not make investment decisions on a policy-by-policy basis, rather, they pool money for investments, the performance of those investments does not depend in any way on the premium payment patterns of any particular policyholder or subset of policyholders. In other words, issue-age and face-amount, the criteria that AXA used for

1  determining the subset of policies to saddle with an enormous COI increase, do not
2  coincide with any actuarially acceptable reasons for imposing a COI increase on the
3  selected policies. As a result, the increase is not being implemented "on a basis that is
4  equitable to all policyholders" in the relevant policy class.

55. Finally, AXA has not increased COI rates across the board for other UL policies. Indeed, in its FAQ on the AUL II increase, AXA states that "at this time, we have no plans to raise COIs on any other products, including products we are currently selling." Had AXA actually experienced deviations from its expectations of future mortality or investment income, its COI rates would have increased for a broad range of life insurance policies. That it did not implement any such broad increase confirms that the COI increases are being used to unfairly target certain policies and policyholders in an inequitable manner, and premised on improper factors not provided for in the policy.

### V.    CLASS ACTION ALLEGATIONS

56. Plaintiffs bring this action individually, and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to herein as the "AXA COI Increase Class"—consists of:

> All owners of Athena Universal Life II issued by AXA Equitable Life Insurance Company that were subjected to a cost of insurance rate increase announced by AXA on or about October 1, 2015 (excluding defendant AXA, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

57. The AXA COI Increase Class consists of hundreds of consumers of life insurance, and is thus so numerous that joinder of all members is impracticable. The identities, and addresses, of class members can be ascertained readily from business records maintained by AXA.

58. The claims asserted by Plaintiffs are typical of the claims of the AXA COI Increase Class.

59. Plaintiffs will fairly and adequately protect the interests of the AXA COI Increase Class, and do not have any interests antagonistic to those of the other members

13

of this class.

60. Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

61. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include, but are not limited to:

    (a) the construction and interpretation of the form insurance policies at issue in this litigation;

    (b) whether AXA's actions to increase the cost of insurance charges on the AUL II policies violated the terms of those form policies;

    (c) whether AXA breached its contracts with the class members; and

    (d) whether Plaintiffs and Class members are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages.

62. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    (a) due to the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

    (b) when AXA's liability has been adjudicated, claims of all class members can be determined by the Court;

    (c) this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

    (d) without a class action, many class members would continue to suffer

injury, and AXA's violations of law will continue without redress while defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

(e) this action does not present any undue difficulties that would impede its management by the Court as a class action.

## VI.   CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(ON BEHALF OF PLAINTIFFS AND THE AXA COI INCREASE CLASS)**

63. Plaintiffs reallege and incorporate herein the allegations of paragraphs 1 through 62 of this complaint as if fully set forth herein.

64. The subject policies are binding and enforceable contracts.

65. Under the terms of the policies, specifically, the "Changes in Policy Cost Factors" provision, any changes made to policy cost factors must be made on a "basis that is equitable to all policyholders of a given class" and determined based on the enumerated factors listed therein.

66. AXA's rate increase has materially breached the Policies in several respects, including but not limited to the following:

(a) AXA breached the policies by increasing COI rates based on a policy's issue age and face value even though those factors are not included in the permissible and enumerated bases for increasing cost of insurance rates;

(b) AXA breached the policies by increasing the COI rates on bases that do not apply equitably to the class of insureds; and

(c) AXA breached the policies because AXA's COI rate increase was not based on the permissible factors stated in the policies, such as AXA's expectations of future mortality.

15

67. Plaintiffs have performed all of their obligations under the policies, except to the extent that their obligations have been excused by AXA's conduct as set forth herein.

68. As a direct and proximate cause of AXA's material breaches of the policies, Plaintiffs and the COI Increase Class have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (ON BEHALF OF PLAINTIFFS AND THE AXA COI INCREASE CLASS)

69. Plaintiffs reallege and incorporate herein the allegations of paragraphs 1 through 62 of this complaint as if fully set forth herein.

70. The subject policies are binding and enforceable contracts.

71. Each of the policies includes an implied covenant that AXA will act in good faith and deal fairly. This duty requires that neither party do anything that prevents the other party from receiving the benefits of their agreement.

72. Under the terms of the policies, specifically, the "Changes in Policy Cost Factors" provision, any changes made to policy cost factors must be made on a "basis that is equitable to all policyholders of a given class" and determined based on the enumerated factors listed therein.

73. When exercising its duties and obligations under the policy, AXA must exercise any discretion it is given in a way that is consistent with the covenant of good faith and fair dealing.

74. By adopting a methodology to determine premiums that AXA knows will result in premium increases of 25%-70% for a subgroup of elderly policy holders with large policies, AXA breached the duty of good faith and fair dealing by intentionally requiring certain policy holders to forgo their policies (and give up accumulated wealth) or pay egregious premium increases not permitted by the contract. The result is that

16

policy holders, as a result AXA's improper exercise of discretion, are not able to receive the insurance benefits they were promised.

75. To the extent AXA claims the policy increases were the result of the six enumerated factors in the contract, AXA violated the covenant of good faith and fair dealing by unreasonably interpreting the six factors in a way that the rendered the insurance benefits illusory. It is, for example, unfair and unreasonable to construe the six factors as including issue-age and policy value.

76. By undermining Plaintiffs' right only to pay premiums as needed to cover monthly deductions, AXA breached the implied covenant of good faith and fair dealing. By increasing the cost of insurance rates in the manner in which it did, AXA is, among other things, penalizing and deterring policyholders from exercising their contractual right to maintain a minimal policy value, which AXA has no right to do.

77. As a direct and proximate result of AXA's breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

    (a) Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    (b) Appointing Plaintiffs as the Class Representatives and their attorneys as Class Counsel;

    (c) Awarding Plaintiffs and the Class damages pursuant to their First Cause of Action;

    (d) Awarding Plaintiffs and the Class damages pursuant to their Second Cause of Action;

    (e) Awarding Plaintiffs and the Class pre-judgment and post-judgment interest pursuant to their First Cause of Action, as well as costs;

    (f) Awarding Plaintiffs and the Class pre-judgment and post-judgment interest pursuant to their Second Cause of Action, as well as costs; and

(g) Awarding Plaintiffs and the Class such other relief as this Court may deem just and proper under the circumstances.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

RESPECTFULLY SUBMITTED this 24th day of March, 2017.

KAMBERLAW LLP

By: s/ Deborah Kravitz
Deborah Kravitz (*Admitted Pro Hac Vice*)
401 Center St.
Suite 111
Healdsburg, CA 95448

Scott A. Kamber (*Admitted Pro Hac Vice*)
KAMBERLAW LLC
142 West 57th Street
11th Floor
New York, New York 10019

Robert B. Carey (011186)
Leonard W. Aragon (020977)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2017, I electronically filed the foregoing document with the Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants.

/s/  Deborah Kravitz